**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PAUL E. BUBB III,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 4:04-2349** |
| **v.** | : | **(MCCLURE, D.J.)** |
| | | **(MANNION, M.J.)** |
| **JO ANNE B. BARNHART,** | : | |
| **Commissioner of Social** | | |
| **Security,** | : | |
| **Defendant** | | |
| | : | |

## <u>REPORT AND RECOMMENDATION</u>

The record in this action has been reviewed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether there is substantial evidence to support the Commissioner's decision denying the plaintiff's claim for Supplemental Security Income, ("SSI"), under Title XVI of the Social Security Act, ("Act").  42 U.S.C. §§ 1381-1383f.

Based upon a review of the record, it is recommended that the plaintiff's appeal from the decision of the Commissioner of Social Security, (Doc. No. 1), be **DENIED.**

## I. Procedural Background

The plaintiff filed his application for SSI benefits on June 21, 2002, in which he alleged disability since June 1, 1987, due to eye problems, anxiety, autistic tendencies and depression.  (TR. 55, 64).

After his claim was denied (TR. 25-30), the plaintiff's application eventually came on for a hearing before an administrative law judge, ("ALJ"), which took place on July 31, 2003. The plaintiff was represented at the hearing by the same counsel who is representing him in this appeal. In addition to the plaintiff's testimony, the ALJ heard testimony from Helen Bubb, plaintiff's grandmother, and Paul Anderson, a vocational expert. (TR. 129-193).

On November 24, 2003, the ALJ issued a decision in which he found that the plaintiff was not disabled. He found that the plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability, and that he had no past relevant work (20 C.F.R. § 416.965). The ALJ further determined that the plaintiff had an impairment, or a combination of impairments, considered to be "severe" based on the requirements in the regulations (20 C.F.R. § 416.920(b), but that those medically determinable impairments did not meet or medically equal one of the listed impairments in Appendix I, Subpart P, Regulation No. 4. The ALJ found the plaintiff's allegations regarding his limitations not totally credible. The ALJ stated that he carefully considered all of the medical opinions in the record regarding the severity of the plaintiff's impairments (20 C.F.R. § 416.927). The ALJ found the plaintiff retained the residual functional capacity to perform work at all exertional levels, with certain restrictions. Because of the plaintiff's mental impairment, the ALJ found the plaintiff was only capable of performing simple,

routine, low stress, unskilled work, with not more than occasional contact with the public and co-workers. The ALJ stated that considering the types of work that the plaintiff was functionally capable of performing, in combination with the plaintiff's age, education and work experience, he could be expected to make a vocational adjustment to work that exists in significant numbers in the regional, state and national economies. Examples of such jobs included work as a laundry worker, packer, sorter, and as a machine tender. As a result, the ALJ concluded that the plaintiff was not under a "disability," as defined in the Social Security Act, at any time through the date of the ALJ's decision. (TR. 20-21).

The plaintiff filed a request to review the ALJ's decision with the Appeals Council, which was denied on August 27, 2004. (TR. 4-7). Thus, the ALJ's decision stood as the final decision of the Commissioner. Currently pending before the Court is the plaintiff's appeal of the decision of the Commissioner of Social Security filed on October 26, 2004.  (Doc. No. 1).

## II. Disability Determination Process

A five step process is required to determine if an applicant is disabled for purposes of social security disability insurance.  The Commissioner must sequentially determine: (1) whether the applicant is engaged in substantial gainful activity; (2) whether the applicant has a severe impairment; (3) whether the applicant's impairment meets or equals a listed impairment; (4)

whether the applicant's impairment prevents the applicant from doing past relevant work; and (5) whether the applicant's impairment prevents the applicant from doing any other work. (20 CFR § 416.920 (2000)).

The instant action was ultimately decided at the fifth step of the process when the ALJ determined that the plaintiff retained the residual functional capacity to perform a wide range of work with certain non-exertional limitations, and that such work existed in significant numbers in the regional, state and national economies. (TR. 19).

## III.  Evidence of Record

The plaintiff was born on May 28, 1983, and was 20 years old at the time of the ALJ's decision. (TR. 14, 45, 64). The plaintiff alleges that he has been disabled since June 1, 1987, because of autistic tendencies, anxiety, and depression. (TR. 45, 55).  The ALJ determined that he did not have any past relevant work. (TR. 18). The plaintiff graduated from high school and has at least one semester of college studies. (TR. 19, 61, 143).

The medical evidence of record establishes that the plaintiff had one period of hospitalization in October 1987, when he was 4 years old, because he exhibited bizarre behaviors and was dysfunctional in the home setting. (TR. 78-79). Following a mental evaluation, E. John Khunley, M.D., stated that the plaintiff likely had a pervasive developmental disorder with manifestations of mild mental retardation. (TR. 45, 78-79). At discharge, Dr. Khunley

4

documented that the plaintiff did not require psychotropic medication, nor did he recommend counseling. Dr. Khunley did suggest speech therapy and that his parents receive counseling which focused on behavior management. (TR. 79). Dr. Khunley also recommended that the plaintiff be placed in a structured academic setting. (TR. 78-79). There is no evidence of subsequent inpatient treatments, or ongoing outpatient treatment while growing up. (TR. 58-59, 77-86, 106-10, 112-19).

On August 7, 2002, Michael Gillum, M.A., a licensed psychologist, evaluated the plaintiff, and wrote a report which included a summary of the plaintiff's medical history. (TR. 84-85). Mr. Gillum stated that the plaintiff first sought counseling services on December 14, 2001, and had been seen periodically since then, to "de-escalate him around specific fears or concerns in life." The plaintiff "usually" showed fears of events that had "not actually happened." (TR. 84). For example, the plaintiff's grandmother, Mrs. Bubb, reported that the plaintiff had "been worried since 9-11 that he might have to go into the service." She also stated that the plaintiff had "autistic tendencies," and that "his eyesight isn't the best." (TR. 75).

Mr. Gillum reported that the plaintiff consulted with him in December 2001, seeking treatment to reduce his anxiety and enhance his coping and social skills in order to help him remain in high-school. (TR. 84). The plaintiff was prescribed the anti-anxiety medication Celexa. (TR. 85, 148).

Mr. Gillum also reported that the plaintiff presented with a "variety" of

symptoms which were not easily classified. (TR. 84). Mr. Gillum reported that the plaintiff was "often" unable to be around other people outside of his immediate family. (TR. 85). Mr. Gillum's diagnosis was generalized anxiety disorder, social phobia, a learning disability, and a pervasive developmental disorder. (TR. 84). Mr. Gillum opined that the plaintiff's social phobia would likely prevent him from obtaining "typical" employment, and he therefore referred the plaintiff for vocational rehabilitation.

Mr. Gillum further stated that even if the plaintiff worked in a position where he was the only employee, he would be distracted by his internal anxiety and fears, and that it would be difficult for him to learn new tasks or concentrate on the task at-hand. (TR. 85). Mr. Gillum rated the plaintiff's global assessment of functioning (GAF) at 60.[1] (TR. 84).

School records indicate that the plaintiff graduated from high-school in June of 2002, and ranked 67 out of a class of 211, with a grade point average of 89.89, which was equivalent to a "B". He never exhibited behavioral problems at school. (TR. 61, 86, 141, 143).  He was a full-time student, who took advanced placement courses beginning in the 10th grade. (TR. 86). His academic workload in high-school included courses in English, U.S. and World

---

[1]GAF 51-60 indicates moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers). *Diagnostic and Statistical Manual of Mental Disorders, p. 32. (4th Ed. 1994).*

History, Spanish, Geometry, Pre-Algebra, Chemistry, Biology, and Physics. (TR. 142). The plaintiff began college in January 2003. He took courses in English Composition, Philosophy, Religion, and Political Science. In his first semester of college, the plaintiff earned a 2.9 grade point average. (TR. 143-44). The plaintiff applied for SSI benefits shortly after graduation from high school in June 2002.

In April 2003, Richard Dowell Jr., Ph.D., a clinical neuropsychologist, evaluated the plaintiff to assist in identifying potential factors which contributed to his social delay problems, and to help develop an intervention program for him. (TR. 106-110). Dr. Dowell noted that the plaintiff's medical history is "remarkable for satisfactory academic and cognitive development." (TR. 106). Dr. Dowell stated that the plaintiff appeared well-kept and in no apparent distress. He was oriented in all spheres. His speech was normal. He exhibited a "very well developed" vocabulary and knowledge base. His receptive language skills were satisfactory and he gave appropriate and accurate responses in social conversation. His social interaction was generally friendly and positive, although he did not initiate interaction and made no extended effort to engage his examiners. His mood was "very stable." He tended to display frustration when he received negative feedback or was in a novel situation, but otherwise he exhibited satisfactory attention, concentration and motivation to tasks. His responses tended to be organized with features of forethought and planning. (TR. 108).

7

Dr. Dowell administered the Wechsler Intelligence Scale for Children-III (WISC-III). The results indicated verbal, performance and full scale IQ scores of 103, 97 and 100, respectively.  This placed him in the average range of intellectual functioning. Overall, Dr. Dowell found that the plaintiff's deficits were in higher level executive functions. (TR. 108-09) (Doc. 11, pp. 6-7).

The plaintiff's Millon Clinical Multiphasic Inventory-II profile was characterized by anxiety and dysthymia/depression, but his Hamilton Anxiety and Depression Scales results indicated he was only in "mild" distress. (TR. 109). Dr. Dowell diagnosed Asperger's Syndrome[2] and a schizoid personality disorder.  Dr. Dowell concluded that the plaintiff generally functioned "well" and assessed his GAF score at 70[3] (TR. 110). Dr. Dowell had no specific recommendations for additional treatment. (TR. 110).

---

[2]Asperger's Syndrome is a developmental disorder in which people have difficulties understanding how to interact socially. People with Asperger's syndrome have some traits of autism, especially weak social skills and a preference for sameness and routine. However, unlike those with autism, children with Asperger's syndrome usually start to talk around 2 years of age (the age at which speech normally develops). They have normal to above-normal intelligence.  *http://my.webmd.com/hw/mental_health/zq1009.asp*

[3]A GAF score of 61-70 indicates some mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *Diagnostic and Statistical Manual of Mental Disorders,* p. 32. (4th Ed. 1994).

Treatment records from Andrew Hausmann, M.D., the plaintiff's general practitioner, reveal that the plaintiff's emotional condition was "stable." He was in no emotional distress. (TR. 114,116,139). On November 15, 2002, the plaintiff was examined by Dr. Hausmann. Dr. Hausmann reported that the plaintiff had normal hearing, his eyesight was 20/50 in the left eye and 20/40 in the right eye, his "general state of health" was "good" except that he was overweight, had significant acne on his face, back and shoulders, and had an ingrown toenail. The plaintiff reported to Dr. Hausmann that he had been diagnosed with a depression disorder since November 5, 2002, and that he was prescribed Celexa. (TR. 112-114).

On August 23, 2002, James Cunningham, Ed.D., a state agency consultant, completed a Residual Functional Capacity (RFC) assessment based on the plaintiff's medical records. (TR. 87-104). Dr. Cunningham opined that the plaintiff had moderate restrictions in his ability to complete a normal work week without interruptions from his psychological symptoms. (TR. 89). The plaintiff also had mild limitations in his activities of daily living, and in his ability to maintain persistence, concentration and pace. (TR. 102). He also had moderate difficulties in maintaining social functioning. (TR. 102).

At the hearing before the ALJ, the plaintiff testified that he lives with his grandparents, his aunt and his two cousins, ages seven and eight. He stated that both of his cousins "have a lot of problems" and "several mental conditions." (TR. 137).

9

With regards to his physical health, the plaintiff complained of pain in his left knee, however, he has not been prescribed any medication, diagnostic testing, or therapy for knee pain. Further, there is no mention in the medical records that the plaintiff ever complained of knee pain. (TR. 138-139).

The plaintiff testified he has occasional migraine headaches for which he was prescribed Axert, on an as-needed basis. (TR. 140). The plaintiff testified that he is six feet one inches tall and weighs two hundred and ninety four pounds. He does not follow any special diet. (TR. 140-141).

The plaintiff stated that he has never attempted to work, but had once applied for a job, unfortunately, "they never called [him] back." (TR. 145).

The plaintiff testified that he was attending college and acknowledged that once he finished college, he would have to start working. (TR. 146). The plaintiff stated that he felt he was not ready to hold down a job because he has difficulty if he tries to do more than one thing at a time. (TR. 146).

The plaintiff reported that he had registered for his next semester in college, and he selected several classes including, Spanish, introduction to criminal justice, history of western civilization, and chemistry. (TR. 148).

The plaintiff testified that his hobbies included watching television, playing on his computer, and reading. (TR. 148). He spends up to "hours" on his computer surfing the internet. (TR. 152-153). He watches television between two and seven hours a day. (TR. 154). He reads three to five hours a day. His favorite types of novels are action, science fiction, and fantasy. (TR.

155). He "can't stand sports" and tends to "avoid the news" because it is just "one disaster after another." (TR. 154, 166-167).

The plaintiff sees his mother on Sundays after church. (TR. 158, 160). He stated that he has a good relationship with his grandmother and aunt but not with his grandfather. (TR. 162).

The plaintiff stated that at the mall he experiences "mild anxiety around a bunch of people in a small place." (TR. 164). He stated that he worries about "events that might happen" and has a tendency to view things "out of proportion." (TR. 166). The plaintiff also reported some difficulty falling sleep at night. (TR. 170). Some days he does not want to get out of bed because he feels "completely useless." (TR. 170). At times he has difficulties remembering and following verbal instructions. (TR. 170-171). He angers easily and often raises his voice. (TR. 171).

His household chores consist of taking out the garbage, cleaning the yard, and mowing the lawn. (TR. 149). He vacuums and cleans on occasion. (TR. 151).

Mrs. Bubb, the plaintiff's grandmother, testified that her grandson gets along well with other family members but prefers to stay in his bedroom. (TR. 176). He accompanies her on errands but insists that Mrs. Bubb follow a pre-set schedule. He gets upset when she deviates from what she has planned. (TR. 177).

A vocational expert ("VE") also testified at the hearing. The ALJ asked

the VE whether work was available for a hypothetical individual who was plaintiff's age, had his education, could do heavy work, but was restricted to unskilled, simple, routine, low-stress work employment with no more than occasional contact with co-workers and the public. The VE advised that such an individual could perform a significant number of such jobs, such as work as a laundry worker (82,000 jobs), packer (986,000 jobs), sorter (161,000 jobs), and machine tenderer (205,000 jobs). (TR. 188). The VE explained that these jobs would be performed in a "structured" environment and could be performed by someone who did not work or interact well with others, or who did not respond well to change. (TR. 190).

## IV.  Discussion

The plaintiff argues that the Commissioner committed two errors at the administrative level. Specifically, the plaintiff avers that the ALJ erred in concluding that the plaintiff did not meet or equal a listed impairment, and erred in concluding that the plaintiff has the residual functional capacity to perform substantial gainful work activities. He claims that the ALJ's credibility determinations are not supported by substantial evidence, and he maintains that a more balanced review of the record must compel the conclusion that plaintiff was disabled from any kind of gainful activity as of June 1, 1987, the alleged onset date of disability. He requests that this court reverse or remand the ALJ's decision. (Doc. No. 8).

The Commissioner responds that the sole issue is whether substantial evidence supports the ALJ's finding that, despite his mental impairments, the plaintiff retained the residual functional capacity to perform a wide range of work, with certain non-exertional restrictions.

After carefully reviewing the record, it appears that the ALJ's findings are supported by substantial evidence of record. As a result, the decision should not be disturbed on appeal.

The plaintiff argues that he meets impairment listings 12.06, 12.08 and 12.10.  The plaintiff states:

> Plaintiff was found to suffer from anxiety-related disorder (listing 12.06), a personality disorder (12.08) and Asperger's syndrome (12.10)...
>
> ...In evaluating the impact of a mental health impairment...the ALJ must consider the claimant's ability to function independently, appropriately, effectively and on a sustained basis.  In making this assessment, the ALJ is to look at the quality and level of overall functioning, the amount of supervision and/or assistance required, and the settings in which the claimant is able to function. 20 C.F.R. § 416.920a(c)(2).

(Doc. No. 10, pp. 12-13).  Notably, otherwise, the plaintiff does not recite the precise elements necessary to establish disability under listings 12.06, 12.08, and 12.10.

Listing 12.06 states:

> 12.06  *Anxiety Related Disorders*: In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms: for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

13

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A.   Medically documented findings of at least one of the following signs or symptoms:

1.   Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a.   Motor tension; or
b.   Autonomic hyperactivity; or
c.   Apprehensive expectation; or
d.   Vigilance and scanning; or

2.   A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3.   Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4.   Recurrent obsessions or compulsions which are a source of marked distress; or

5.   Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B.   Resulting in at least two of the following:

1.   Marked restriction of activities of daily living; or

2.   Marked difficulties in maintaining social functioning; or

3.   Marked   difficulties   in   maintaining

14

concentration, persistence, or pace; or

4.      Repeated episodes of decompensation, each of extended duration.

OR

C.      Resulting in complete inability to function independently outside the area of one's home.

Listing 12.08 applies to Personality Disorders and states:

....A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A.      Deeply ingrained, maladaptive patterns of behavior associated with one of the following:

1.      Seclusiveness or autistic thinking; or

2.      Pathologically inappropriate suspiciousness or hostility; or

3.      Oddities of thought, perception, speech and behavior; or

4.      Persistent disturbances of mood or affect; or

5.      Pathological dependence, passivity, or aggressivity; or

6.      Intense and unstable interpersonal

15

relationships and impulsive and damaging behavior;

AND

B.    Resulting in at least two of the following:

1.    Marked restriction of activities of daily living; or

2.    Marked difficulties in maintaining social functioning; or

3.    Marked difficulties in maintaining concentration persistence, or pace; or

4.    Repeated episodes of decompensation, each of extended duration.

Listing 12.10 pertains to autistic and other pervasive development disorders and states:

...*Autistic disorder and other pervasive developmental disorders*: Characterized by qualitative deficits in the development of reciprocal social interaction, in the development of verbal and nonverbal communication skills, and in imaginative activity. Often, there is a markedly restricted repertoire of activities and interests, which frequently are stereotyped and repetitive.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

B.    Medically documented findings of the following:

1.    For autistic disorder, all of the following:

a.    Qualitative deficits in reciprocal social interaction; and

b.    Qualitative deficits in verbal and nonverbal communication and in imaginative activity; and

c.    Markedly restricted repertoire of activities or interests;

16

OR

    2.    For other pervasive developmental disorders, both of the following:

        a.    Qualitative deficits in reciprocal social interaction; and

        b.    Qualitative deficits in verbal and nonverbal communication and in imaginative activity;

AND

    B.    Resulting in at least two of the following:

        1.    Marked restriction of activities of daily living; or

        2.    Marked difficulties in maintaining social functioning; or

        3.    Marked difficulties in maintaining concentration, persistence, or pace; or

        4.    Repeated episodes of decompensation, each of extended duration.

(Appendix I, Subpart P, Regulation No. 4.)

The plaintiff maintains that "the ALJ found that Plaintiff satisfied his burden of proof for Part A of each listing." (Doc. No. 10, p. 13). The plaintiff therefore only addressed the Part B criteria of the listings, which are essentially the same for the three listings, and are directed to the question of whether the particular mental disorder has a marked effect on the plaintiff's abilities to perform activities of daily living.

Upon careful review of the ALJ's decision, we believe that the plaintiff is mistaken in his conclusion that the ALJ found that the plaintiff satisfied his

burden of proof for Part A of each listing. The ALJ stated:

> The claimant's attorney <u>contends</u> the claimant meets the criteria of Listing 12.06 and 12.08. However, the claimant's mental impairments are not accompanied by sufficient functional limitations so as to meet the "B" criteria of Sections 12.06, 12.08 or 12.10...

(TR. 16)(emphasis added). While it is true that the ALJ did acknowledge that the plaintiff "suffers from an anxiety disorder, personality disorder and a pervasive developmental disorder," he did not state, at any time, that the plaintiff had "satisfied his burden of proof for Part A of each listing."

The ALJ did, however, concentrate his discussion of the claim on the Part B criteria, which as noted above, requires that the evidence of record establish that the mental disorder results in marked restriction of either the activities of daily living; in maintaining social functioning; in maintaining concentration, persistence, or pace, or in repeated episodes of decompensation, each of extended duration.  The ALJ noted that the record simply could not support a finding that the plaintiff's mental impairments resulted in marked restrictions in any of these areas.

The plaintiff argues that the testimony of both the plaintiff and his grandmother establishes that his mental impairments do, in fact, result in marked restrictions in these areas of daily living. The plaintiff asserts that "[h]e clearly depends on others to ensure that his needs are met, even though he has the knowledge and physical ability to attend to those needs himself." (Doc. No. 10, p. 15).

The problem with the plaintiff's argument is that the ALJ did not find the plaintiff's testimony regarding the severity of his limitations to be fully credible. It is undisputed that the plaintiff has mental impairments, however, his perceived severe limitations are subjective. Even though the ALJ must give serious consideration to a claimant's subjective complaints, he may discredit those subjective complaints where they are not consistent with other evidence of record. Jesurum v. Secretary United States Department of Health & Human Services, 48 F. 3d 114 ( 3d Cir. 1995); Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993). Credibility determinations as to a claimant's testimony regarding his limitations are for the Administrative Law Judge to make.   VanHorn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983).  "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the Administrative Law Judge's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984).

The Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered. (20 C.F.R. § 404.1529). First, symptoms will only be considered to affect a claimant's ability to perform work activities if such symptoms result  from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. (20 C.F.R. § 404.1529(b)). Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their

impact on the claimant's ability to work. 20 C.F.R. §404.1529(b).  In so doing, the medical evidence of record is considered along with the claimant's statements. 20 C.F.R. § 404.1529(b).  Social Security Ruling 96-7p gives the following instructions in evaluating the credibility of the claimant's statements regarding his or her symptoms:

> [I]n general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p.

Applying these standards, the ALJ made specific findings as to the intensity and persistence of the plaintiff's symptoms, based on the record as a whole.  He gave precise reasons for the weight he gave to the plaintiff's testimony.  Those reasons appear to be valid.

The ALJ stated:

> The undersigned notes that the claimant is not socially engaging. He waits to be approached by others, and does not initiate friendships or initiate contact with the friends he does have. However, he does socialize with a few friends, one in particular. He goes to the movie theatre and to the store with his family members. He attends religious services, but feels more comfortable sitting in the back of the church. The claimant also uses the computer a lot playing games, sending e-mail, and watching DVD movies. He spends 3-5 hours a day reading

materials such as action, adventure, science fiction and fantasy.

Accordingly, the undersigned finds the claimant retains the residual functional capacity to perform work at all exertional levels. However, because of the claimant's mental impairment, the undersigned finds the claimant is capable of performing simple, routine, low stress, unskilled work, with not more than occasional contact with the public and co-workers." (TR. 18).

The ALJ also noted that Dr. Gillum stated that the plaintiff has improved with outpatient psychotherapy and psychomedication, and is able to function much better at times. The ALJ noted further that Dr. Dowell reported that the plaintiff's social interactions were generally friendly and positive; and that he demonstrated satisfactory attention and concentration and motivation to tasks. (TR. 15, 16).

We note that the plaintiff himself testified that he expected to work after graduation from college. He stated, "I can't very well stay unemployed after that." Furthermore, the plaintiff stated that the reason he was not presently employed was because he was focusing on his education, and that "handling two important things at once, it's never one of my better qualities..." (TR. 146).

Finally, no treating or examining physician rendered an opinion that the plaintiff is completely disabled from any or all employment as a result of his mental impairments. In fact, although Dr. Gillum did render an opinion on August 7, 2002, that gainful employment "at this time would not appear to be an option" for the plaintiff, he also referred the plaintiff for vocational rehabilitation services, and stated that employment was a possibility, "maybe

in the future if outpatient psychotherapy and medication regimens become more intensive." (TR. 85).

To receive disability benefits a claimant must demonstrate that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." (42 U.S.C. A. 423 (d)(1)(A)(1991)). The ALJ concluded that although the plaintiff does suffer from a combination of mental impairments, he has only recently begun appropriate treatment and that "there is no indication [in the record] that symptoms will not be ameliorated over time." (TR. 18). The record supports this conclusion. As a result, the plaintiff has not meet his burden.

## V.  Recommendation.

On the basis of the foregoing, **IT IS HEREBY RECOMMENDED THAT** the plaintiff's appeal from the decision of the Commissioner of Social Security, (Doc. No. 1), be **DENIED.**

S/ Malachy E. Mannion
**MALACHY E. MANNION**
United States Magistrate Judge

Dated:   December 2, 2005
O:\shared\REPORTS\2004 Reports\04-2349.01.wpd